**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **WESLEY MESSENGER SERVICE, INC.,** an Oklahoma corporation, | )<br>)<br>) |
| **Plaintiff,** | )<br>) |
| v. | )  Case No. 04-CV-0858-CVE-FHM<br>) |
| **AMERICAN STANDARD, INC., d/b/a Trane, d/b/a Aire Systems, a foreign corporation,** | )<br>)<br>) |
| **Defendant.** | ) |

**OPINION AND ORDER**

Now before the Court are plaintiff's Motion for Summary Judgment (Dkt. # 33), and defendant's Motion for Summary Judgment (Dkt. # 35). Plaintiff, Wesley Messenger Service, Inc. ("WMS"), moves for summary judgment on its breach of contract claim. Defendant, American Standard, Inc., d/b/a Trane, d/b/a Aire Systems ("Trane"), moves for summary judgment on plaintiff's breach of contract claim. Plaintiff alleges that defendant breached their Transportation Agreement ("Agreement") by failing to pay a total of $131,744.42[1], plus interest thereon, for services rendered after plaintiff properly performed said services under the contract. Defendant does not deny that plaintiff adequately performed its services, but argues that defendant fully performed its payment obligations under the Agreement by rendering payments to Eagle Transportation Associates, Inc. ("Eagle"). Defendant argues that John Rhodes ("Rhodes"), an employee and corporate officer of WMS, had the apparent authority to divert payments to Eagle. By contrast,

---

[1] In its motion for summary judgment, plaintiff alleged that defendant owed $127,762.58, plus interest thereon. This figure represented thirty (30) allegedly unpaid invoices sent from plaintiff to defendant. In plaintiff's reply brief in support for its motion for summary judgment (Dkt. # 64), plaintiff stated that there were, in fact, thirty-one (31) unpaid invoices totaling $131,744.42.

plaintiff argues that (1) defendant's payment to Eagle constituted an assignment in breach of the Agreement and (2) Rhodes did not have apparent authority to direct payments to Eagle. As the plaintiff's and defendant's motions for summary judgment concern the same facts and issues of law, the Court considers both motions in this Opinion and Order.

## I.

On October 10, 2003, Trane and WMS entered into the Agreement whereby WMS agreed to transport freight shipments from Trane's manufacturing plant for the Aire Systems division of Trane. Dkt. # 35, Ex. 1, Transportation Agreement. The Agreement stated, "any payments due or to become due hereunder, shall not be assigned by either party without the prior written consent of the other party." Dkt. # 35, Ex. 1, ¶ 18. The Agreement further stated that "any further representations, agreements understandings, or waivers to be binding upon the parties hereto must be reduced in writing and attached hereto." Id. ¶ 19. Under the Agreement, the contract provisions are to be construed and enforced according to Delaware law. Id. ¶ 32. Rhodes signed the Agreement on behalf of WMS, and John Shay, Vice President of WMS, served as witness for WMS. Dkt. # 35, Ex. 1.

WMS hired Rhodes in August 2003, approximately two months before Rhodes signed the Agreement. Rhodes held the position entitled "Director of Brokerage Operations." Dkt # 35 at 2. After having been hired by WMS and before signing the Agreement, Rhodes sent a letter to Trane manager Lina Fanning ("Fanning") to inquire about the opportunity to provide freight services for Trane. Included with this letter was a company profile that listed Rhodes under both the headings of "Sales" and "Company Officers." Dkt. #35, Ex. 2, Deposition of James Shay. Rhodes also met with Fanning and another Trane manager, Dan Kirkland ("Kirkland"), in late October 2003 to

establish a business relationship with Trane. Dkt. # 34, Ex. C. Kirkland Deposition. On the date the Agreement was executed, Rhodes was listed as one of the five corporate officers in WMS's company profile. Dkt # 35, Ex. 3, Company Profile.

On October 22, 2003, Rhodes sent an email to Fanning asking to whom WMS should submit its bills. Fanning responded that WMS should send its invoices to Cass Information Systems, Inc. ("Cass"), a company with which Trane had contracted to process its bills. Dkt. # 34, Ex. G, Email from Fanning to Rhodes. On October 27, 2003, Rhodes, without the knowledge or express approval of WMS, sent an email to Fanning stating that payments due to WMS for services rendered should be made to Eagle Transportation Associates in Broken Arrow, Oklahoma. Dkt. # 34, Ex. K. The email stated that Eagle was a "sister company of WMS, Inc and that all future payments for and on behalf of WMS, Inc will be processed through ETA, Inc." Id. Both Rhodes and Fanning sent this payment information to Cass. In fact, Eagle was not related in any manner to WMS, and WMS had no knowledge of Rhodes' instructions that Trane make payments to Eagle for WMS' services. Eagle was not incorporated by Rhodes until November 10, 2003. Dkt. # 34, Ex. L, Records of Oklahoma Secretary of State.

On November 5, 2003, Rhodes sent a lengthy email to Fanning wherein he expressed several concerns about WMS. Dkt. # 34, Ex. M. Rhodes stated that WMS was not fulfilling its obligations to him and stated that he was concerned about the financial stability of WMS. Id. He noted that he was in contact with other companies and was preparing to "make a move" from WMS and possibly start his own trucking company. Id. Also on November 5, 2003, Rhodes entered into an "Expedite Service Agreement" with Cass. Dkt. # 43, Ex. K. Under this agreement, Cass agreed to pay electronically invoices submitted by WMS within two business days for a .005% discount on each

invoice. Id. The Expedite Service Agreement also provided that Cass should pay WMS invoices to an account number at the Tulsa Federal Employees Credit Union. Id. In fact, the credit union account was in Rhodes' name. Rhodes signed the Expedite Service Agreement as "Operations Manager – WMS" and as "President – Eagle Transportation Associates (ETA)." Id.

Between October 28, 2003 and December 5, 2003, WMS transported thirty (30) shipments of freight for Trane. Dkt # 34, Ex. E, Affidavit of James Shay. WMS performed these services satisfactorily and in compliance with the Agreement. After each shipment, WMS prepared a bill and submitted it to Cass. Dkt. # 43, Ex. M, WMA Invoices. On or about the same time, Cass received invoices submitted by Carr that directed payment to be made to Eagle for services performed by WMS . Dkt. # 43, Ex. N, Eagle Invoices. As part of its business procedure, once Cass received an invoice, it determined whether a payment had already been made for that invoice; if so, then Cass rejected the "duplicate" invoice and did not pay it. Dkt. # 43, Ex. L, Zygmunt Deposition. Between November 14, 2003 and December 12, 2003, Cass received thirty-one (31) invoices from Rhodes directing payment to Eagle. Cass paid thirty (30) of these thirty-one (31) invoices for a total of $94,456.09 to Eagle. Dkt. # 43, Ex. O, Cass Spreadsheet. Between November 7, 2003 and mid January 2004, WMS submitted 31 invoices to Cass; however, Cass paid none of these genuine invoices because it believed that they were mere duplicates.

WMS discovered Rhodes' fraudulent activities on or about December 17, 2003, promptly gave notice to Trane and Cass, and terminated Rhodes on December 18, 2003. Dkt. # 43, Ex. B, Shay's Affidavit.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

**III.**

Plaintiff alleges that defendant breached the Agreement by making payments to Eagle instead of WMS. Plaintiff argues that this conduct constituted an assignment of WMS's right to payment and a contract modification that did not comport with the terms of the Agreement. Whereas plaintiff argues that Rhodes did not have the apparent authority to authorize payment to Eagle, defendant argues that Rhodes had such apparent authority. By making payments to Eagle according to Rhodes' instructions, defendant contends that it fully performed its contractual duties and is therefore entitled to summary judgment on its breach of contract claim. The Court determines that there is a genuine issue of material fact as to whether Rhodes had the apparent authority to authorize payments to Eagle; thus, the Court denies both plaintiff's and defendant's motions for summary judgment.

**A.**

Plaintiff argues that Trane's payment to Eagle constituted an assignment in breach of the Agreement. The Agreement expressly stated, "payments due or to become due hereunder, shall not be assigned by either party without the prior written consent of the other party." Dkt. # 35, Ex. 1. In support of this contention, plaintiff argues that payment to a third party, by definition, is an assignment. Plaintiff also points to Kirkland's testimony that he (Kirkland) understood the payments by Trane to Eagle to be an assignment. See Dkt. # 44, Ex. 3.

Plaintiff's characterization of the payment to Eagle as an assignment is incorrect. Under both Oklahoma and Delaware[2] law, an assignment of a right is the manifestation of the assignor's

---

[2] The Agreement stated that the provisions therein are to be construed according to Delaware law. Dkt. # 35, Ex. 1.

intention to transfer its right such that the right is no longer owned by the assignor. Hoffman v. Barnett, 178 P.2d 89, 90 (Okla. 1946) (an assignment is "an expression of intention by one that his rights shall pass to and be owned by another"); In re Kaufman, 37 P.3d 845, 850-51 (Okla. 2001) (an assignment "passes the assignor's title" and "realigns the parties to a contract"); Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co., 654 F. Supp. 1419, 1442 (D. Del. 1987) (noting that, while an assignment need not be memorialized in any particular form of words, there must be a sufficient manifestation of intent to assign completely one's right or rights in a contract). Here, Rhodes' instruction did not constitute an assignment. He stated that Eagle was a sister company of WMS and that "all future payments *for and on behalf of WMS, Inc* will be processed through [Eagle]" (emphasis added). Dkt. # 34, Ex. K. Therefore, according to Rhodes' statement, WMS did not give up its right to the payments but asserted its right to payment through this "sister company." Since Rhodes never indicated that WMS was transferring its right to payment, his statements cannot be construed as having creating an assignment. That fact that Eagle was in fact not related to WMS and a part of Rhodes' fraudulent scheme does not change the analysis.

Given that Rhodes's instruction does not constitute an assignment, the Court rejects plaintiff's argument that Trane breached the agreement by failing to comply with the assignment provision in the Agreement.

**B.**

In this case, the primary issue in dispute is whether Rhodes had the apparent authority to authorize that payments be made to Eagle. Plaintiff argues that Rhodes had no apparent authority, and therefore Trane breached the agreement by making payment to a party other than WMS. Defendant argues that it made payments, via its contractual partner Cass, to Eagle based on Rhodes'

apparent authority to authorize such payment. Thus, it fulfilled its contractual obligation. If Rhodes did, in fact, have the apparent authority to authorize payment from Trane to Eagle, then the principal (here, WMS) is bound by the agent's actions. See Ocean Accident & Guarantee Corp. v. Denner, 250 P.2d 217, 220 (Okla. 1952). By contrast, if Rhodes did not have apparent authority and otherwise acted outside of the scope of his authority, actual or implied, then WMS is not bound by Rhodes' actions. See Chicashaw Cotton Oil Co. v. Lamb & Tyner, 114 P. 333, 339 (Okla. 1911). In effect, therefore, whether WMS or Trane must bear the loss that resulted from Rhodes' fraudulent activities depends upon whether Rhodes had the apparent authority to change the recipient of WMS's money.

The legal standard for apparent authority is well-settled in Oklahoma. The existence of actual authority is not a prerequisite to establishing apparent authority. Stephens v. Yamaha Motor Co., 627 P.2d 439, 441 (Okla. 1981). Rather, apparent authority results from a manifestation by the principal to a third party that another is his agent. Id. "The elements that must be present before a third person can hold the principal for the acts of the agent on the theory of apparent authority are (a) conduct of the principal, (b) reliance thereon by the third person, and (c) change of position by the third person to his detriment." Rosser-Moon Furniture Co. V. Oklahoma State Bank, 135 P.2d 336, 338 (Okla. 1943). "[A]pparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." Stephens, 627 P.2d at 441 (quoting the Restatement (Second) of Agency § 8, Comment c). Once a third party knows "the general tenor of the authority with which the agent is vested, the third party is entitled to believe it to include all things usually incident to the exercise of authority of that character and need not busy himself to discover the existence of particular limitations or private restrictions which continue it

within a narrower compass, where nothing appears in the surrounding facts or circumstances to suggest the need of such precautions." Miller & Miller Auctioneers, Inc. v. Mersch, 442 F. Supp. 570, 576 (W.D. Okla. 1977).

The existence of apparent authority is often a factual inquiry. Bridgeport Fireman's Sick and Death Benefit Ass'n v. Desert Fed. Savings and Loan Ass'n, 735 F.2d 383, 388 (10th Cir. 1984). If the facts of the case are such than reasonable persons could not disagree as to the conclusion, then the question of apparent authority could be determined as a matter of law. Id.; Bayless v. Christie, Manson & Woods Int'l, Inc., 2 F.3d 347, 349 (10th Cir. 1993) (determining as a matter of law that the plaintiff-appellant had no apparent authority to deal with trust assets where the only evidence suggesting apparent authority was the fact that the plaintiff was the sole individual who communicated with the defendant-appellee).

In this case, there are few, if any, disputes regarding the facts leading to Trane's payment for WMS' services to Eagle. Both parties agree with the following facts: WMS adequately performed its services under the Agreement; Trane was contractually obligated to pay for those services; Rhodes made misrepresentations to Trane (via Cass in some instances) that payments should be paid to Eagle on behalf of WMS; Rhodes had no actual authority to direct payments to Eagle; Trane made payments to Eagle based on Rhodes' misrepresentations; and WMS never received payments from Trane. Even though these core facts are undisputed, the issue of whether Rhodes had the apparent authority to direct payments to Eagle is not ripe for summary judgment. On the contrary, different implications arise from the facts in this case. Reasonable people could disagree whether WMS evidenced sufficient conduct to cloak Rhodes with the authority to change the payment recipient and whether Trane (via its contractual partner Cass) reasonably relied upon

that conduct.  On the one hand, Rhodes was a corporate officer at WMS and the only WMS employee with whom Trane had any contact.  WMS admits that all other corporate officers, besides Rhodes, had the authority to change the recipient of payment.   In this way, a jury could reasonably infer that WMS cloaked Rhodes with the apparent authority to change the payment recipient based on his role as corporate officer and that Trane reasonably relied on Rhodes' statements based on their existing relationship.  On the other hand, given Rhodes' November 5, 2003 email to Trane indicating tensions between himself and WMS, a jury could reasonably infer that Trane was "on notice" that Rhodes was not acting in the best interest of WMS.  Moreover, regardless of whether it was customary for Cass to send payments to affiliate companies, it is a question for the jury whether Trane/Cass should have blindly relied upon Rhodes' instructions to pay Eagle without further investigating the situation.

Ultimately, given that the facts in this case give rise to different implications, the Court determines that there is a genuine issue of material fact as to apparent authority and that neither plaintiff nor defendant is entitled to summary judgment.

## IV.

**IT IS THEREFORE ORDERED** that plaintiff's Motion for Summary Judgment (Dkt. # 33) is **denied**, and defendant's Motion for Summary Judgment (Dkt. # 35) is **denied**.

**DATED** this 11th day of September, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT